**SHEET METAL WORKERS LOCAL UNION NO. 20, Plaintiff–Appellee,**

v.

**BAYLOR HEATING AND AIR CONDITIONING, INC.,
Defendant–Appellant.**

No. 88–2300.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 18, 1989.
Decided June 13, 1989.

Wm. Michael Schiff, Kahn Dees Donovan & Kahn, Evansville, Ind., for defendant-appellant.

William R. Groth, Fillenwarth Dennerline Groth & Baird, Indianapolis, Ind., for plaintiff-appellee.

Diane Rosse, N.L.R.B., Washington, D.C., for intervenor.

Before WOOD, Jr. and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

HARLINGTON WOOD, Jr., Circuit Judge.

The parties to this labor dispute ask us to determine the validity of an interest arbitration clause in a prehire collective bargaining agreement. Involved are (1) the unilateral repudiation of a collective bargaining agreement, (2) unfair labor charges against the company, (3) arbitration, (4) an arbitration award against the company, (5) a federal suit to enforce the arbitration award, (6) unfair labor charges against the union, (7) an appeal by the company, (8) intervention on appeal by the National Labor Relations Board (NLRB or Board), and (9) a requested stay of this appeal. *See* 29 U.S.C. §§ 157–159, 185 (National Labor Relations Act (NLRA); Labor Management Relations Act of 1947 (LMRA)).[1] The union invoked the district court's jurisdiction under § 301 of the LMRA. The district court enforced the collective bargaining agreement in favor of the union, 688 F.Supp. 462 (M.D.Pa.1988), and the company appeals. We previously granted the Board's motion to intervene. In order to resolve this dispute without further delay, we deny the Board's motion for a stay and decide the contractual issues raised by the parties.

## I. FACTUAL BACKGROUND

Baylor Heating and Air Conditioning, Inc. (Company), defendant-appellant, and

---

1. Modern labor law started with passage of the National Labor Relations Act (NLRA), also known as the Wagner Act, in 1935. 49 Stat. 449 (1935); 29 U.S.C. §§ 151–166. At the risk of oversimplifying this monumental legislative act, the NLRA was designed to promote industrial peace and employee free choice in selecting a representative to bargain collectively with employers. To enforce the provisions of the NLRA, Congress created the National Labor Relations Board. *See H.K. Porter Co. v. NLRB,* 397 U.S. 99, 102–03, 90 S.Ct. 821, 822–23, 25 L.Ed.2d 146 (1970). After 12 years of experimenting with the NLRA, Congress significantly altered the NLRA in 1947 by enacting the Labor Management Relations Act (LMRA). 61 Stat. 156 (1947); 29 U.S.C. §§ 141–187 (scattered sections). The LMRA is known popularly as the Taft–Hartley Act and was codified along with the NLRA under title 29 of the United States Code. Of special importance to the present case, the LMRA granted primary jurisdiction to the federal courts to interpret and enforce collective bargaining agreements. 29 U.S.C. § 185.

Sheet Metal Workers Local Union No. 20 (Union), plaintiff-appellee, signed a prehire collective bargaining agreement authorized by section 8(f) of the NLRA. *See* 29 U.S.C. § 158(f). The Union and the Sheet Metal Contractors' Association of Evansville, Inc. negotiated the agreement and, although not a member of this association, the Company voluntarily agreed to be bound by its terms. The agreement went into effect on May 1, 1984, was signed by the Company on August 21, 1984, and was scheduled to expire on April 30, 1987.

The Company and the Union performed under this agreement without apparent incident until near the end of the agreement's three-year term. In January 1987 the Union anticipated renewal of the agreement and advised the Company that it wished to amend the agreement. The Company had other ideas. On February 26, 1987 the Company advised the Union that it did not intend to sign a new agreement. Thereafter, the Company refused to negotiate with the Union.

The Union responded on March 6, 1987 by filing unfair labor charges with the NLRB. The Union charged that the Company refused to bargain in violation of section 8(a)(5) of the NLRA. *See* 29 U.S.C. § 158(a)(5). On April 14, 1987 the Acting Regional Director of the NLRB found no violation by the Company and refused to issue a complaint for unfair labor practices against the Company. The Union did not appeal this decision to the full Board.

Stymied by the Acting Regional Director, the Union in May 1987 invoked the collective bargaining agreement's interest arbitration clause even though the agreement arguably had been terminated.[2] The Union submitted the dispute to the Adjustment Board (Arbitrator) for resolution. The Company, relying on the NLRB's determi-

nation that it had committed no unfair labor practice when it repudiated the agreement, chose not to participate in proceedings before the Arbitrator. Not surprisingly, on June 24, 1987 the Arbitrator decided in favor of the Union. Without mentioning the Acting Regional Director's action, the Arbitrator enforced the interest arbitration clause and ordered the Company to execute a new agreement with the Union beginning June 1, 1987 and ending June 30, 1991. The terms of agreement ordered by the Arbitrator were similar to the terms of the 1984 agreement. The Company did not file suit to vacate the Arbitrator's decision or file unfair labor charges with the NLRB.

On October 13, 1987 the Union filed suit under section 301 of the LMRA to enforce the arbitration award. *See* 29 U.S.C. § 185. On November 19, 1987 the Company filed unfair labor charges with the NLRB against the Union. The Company filed these charges after it had answered the complaint but before the district judge had ruled. The Company charged that the Union caused the Company to discriminate against its employees in violation of § 8(b)(2) of the NLRA; coerced the Company's employees in violation of § 8(b)(1)(A); engaged in an unlawful secondary boycott in violation of § 8(b)(4)(ii); and attempted to coerce the Company to agree to a collective bargaining agreement in violation of section 8(e). *See* 29 U.S.C. § 158(b). The Company then moved the district court to stay its proceedings until the NLRB resolved the unfair labor charges. The district judge denied the stay, found that the Company's contractual duties were more exacting than its statutory duties, and on June 1, 1988 granted summary judgment in favor of the Union enforcing the arbitration award. The Company, having filed

---

**2.** The interest arbitration clause was contained in Article X, Section 8 of the 1984 agreement. It provided that "any controversy or dispute arising out of the failure of the parties to negotiate a renewal of this Agreement" could be submitted by the Union or the Company to the *National Joint Adjustment Board for the Sheet Metal Industry* (Arbitrator) for arbitration. The Arbitrator's decision was to be final and binding on both parties. The agreement also contained

an automatic renewal clause unless either party provided a written notice of reopening at least 90 days prior to expiration. The agreement would be extended automatically if proceedings were pending under the interest arbitration clause at the expiration date. When the Union filed its unfair labor charges, it proceeded under the NLRA. When the Union invoked the interest arbitration clause, it proceeded under the collective bargaining agreement.

timely notice on June 30, 1988, appeals the district court's judgment.

Approximately three and one-half months after the district judge ordered enforcement of the arbitration award, on September 14, 1988 the Regional Director of the NLRB issued a complaint against the Union for unfair labor practices. The complaint was based on the Company's earlier charges. In an unusual move, the Board then moved to intervene in this court while this appeal was pending. On November 15, 1988 we granted the Board's motion to intervene. The Board now asks us to stay our decision until it resolves the unfair labor practice complaint against the Union.

We consider the Board's request together with the issues raised by the Company. The Company argues that (1) the district court erred by not staying its proceedings until the Board resolved the unfair labor practice charges pending against the Union; (2) the Union should have sought a judicial determination of arbitrability before unilaterally submitting the matter for arbitration; and (3) the interest arbitration clause violates federal labor policy and is consequently void and unenforceable.

## II. ANALYSIS

### A. Request for a Stay

■ The Board asks us to exercise our discretion and grant a stay. The Board states "that the issue to be decided on appeal will also be decided in, and is central to, the unfair labor practice case." The Board wants to decide whether the Union violated the NLRA and national labor policy by enforcing the interest arbitration clause. We must decide whether the district judge erred when, based on the pre-hire agreement, he ordered enforcement of the arbitration award. The Board has jur-

isdiction to resolve unfair labor complaints, see 29 U.S.C. § 160; the district judge has jurisdiction to enforce collective bargaining agreements, see 29 U.S.C. § 185; and we have jurisdiction over both, see 28 U.S.C. § 1291; 29 U.S.C. §§ 160, 185.[3] We could grant the stay, let the Board decide the unfair labor complaint, and then review the district judge's order. Alternatively, we could deny the stay and resolve the issues now before us.

The Union and the Company have suffered through various proceedings with accompanying delay. The Board wants to decide an unfair labor charge that was filed on November 19, 1987 and provided the basis for a complaint issued on September 14, 1988. Although the Board has had jurisdiction since November 1987, it has not decided the unfair labor charge that underlies this controversy. Further delay runs counter to a basic tenet of our national labor policy—labor disputes should be resolved promptly. See UPS v. Mitchell, 451 U.S. 56, 63, 101 S.Ct. 1559, 1564, 67 L.Ed.2d 732 (1981); NLRB v. C & C Plywood Corp., 385 U.S. 421, 430, 87 S.Ct. 559, 565, 17 L.Ed.2d 486 (1967); cf. International Org. of Masters v. Trinidad Corp., 803 F.2d 69 (2d Cir.1986) (stay granted because Board had issued unfair labor practice charge and scheduled a hearing to be conducted within two months of oral argument before the court of appeals).

■ This case involves the Company's contractual duty to arbitrate. Congress intended for the federal courts to resolve contractual disputes. See 29 U.S.C. § 185; Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 562, 96 S.Ct. 1048, 1055, 47 L.Ed.2d 231 (1976); Chicago Typographical Union No. 16 v. Chicago Sun-Times, Inc., 860 F.2d 1420, 1426–27 (7th Cir.1988).

**3.** The Board and the Company question our jurisdiction. They both argue that the interest arbitration clause is void and unenforceable because it is contrary to national labor policy. If they are correct, then there is no agreement to enforce and our jurisdictional base is destroyed. Because this matter is inextricably intertwined with the merits of this litigation, we will address this jurisdictional issue when we address the issues raised by the parties.

Although we have jurisdiction under 29 U.S.C. § 160 to review Board decisions on unfair labor practice charges, the Board has not yet determined whether the Union committed unfair labor practices. Consequently, that issue is not before us. We therefore confine our analysis to the § 301 claim and leave the unfair labor practice charges to the Board.

We agree with the Ninth Circuit that potential for conflict between the Board and the courts does not require a stay. *See International Bhd. of Elec. Workers, Local 532 v. Brink Constr. Co.*, 825 F.2d 207, 213 (9th Cir.1987). Further, we agree that when the underlying controversy is primarily contractual, the Board should defer to the courts. *Id.*

Therefore, we deny the stay. For the same reasons that we deny a stay of this appeal, we also find that the district judge did not abuse his discretion when he denied the Company's request for a stay of the district court proceedings. *See McGough v. First Arlington Nat'l Bank*, 519 F.2d 552, 554 (7th Cir.1975). Even though the Board was allowed to intervene and brief the issues, we proceed cautiously because we do so without the benefit of a Board decision in an area where it is an expert.

*B. Arbitrability*

■ Before evaluating the consequence of the interest arbitration clause, we must determine whether this dispute was properly arbitrable and whether the Union should have sought a judicial determination of arbitrability before it unilaterally submitted the dispute for arbitration. As a general rule, the courts, not arbitrators, determine whether matters are arbitrable. *See AT & T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 649, 106 S.Ct. 1415, 1418–19, 89 L.Ed.2d 648 (1986). When "the parties clearly and unmistakably provide otherwise," however, a prior judicial determination is not necessary. *Id.; see also Toyota v. Automobile Salesmen's Union, Local 1095*, 834 F.2d 751, 754 (9th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 2036, 100 L.Ed.2d 620 (1988), *modified*, 856 F.2d 1572 (9th Cir. 1988).

The parties agreed to arbitrate "any controversy or dispute arising out of the failure of the parties to negotiate a renewal of this Agreement." The Company then unilaterally repudiated the agreement and refused to negotiate a renewal. The Compa-

ny's actions come within the scope of the broad interest arbitration clause that "clearly and unmistakably" evidences the parties' intent to arbitrate. This broad arbitration clause distinguishes the case from cases with limiting clauses that create sufficient ambiguity to require prior judicial determinations of arbitrability, such as *AT & T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986), and *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964). It was not necessary for the Union to obtain a prior judicial determination of arbitrability.

*C. Public Policy*

■ Beyond arbitrability, the primary issue is whether the interest arbitration clause contained in the prehire agreement was void and hence unenforceable because it violated public policy. Whether a clause violates public policy is a matter for the courts, not the arbitrators. *See United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 108 S.Ct. 364, 373–74, 98 L.Ed. 2d 286 (1987); *W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber Workers*, 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983). If the clause violates some "explicit public policy," the courts cannot enforce it. *W.R. Grace & Co.*, 461 U.S. at 766, 103 S.Ct. at 2183 (citing *Hurd v. Hodge*, 334 U.S. 24, 35, 68 S.Ct. 847, 853, 92 L.Ed. 1187 (1948)). "Such a public policy, however, must be *well defined and dominant*, and is to be ascertained *'by reference to the laws and legal precedents* and *not from general considerations* of supposed public interests.'" *W.R. Grace & Co.*, 461 U.S. at 766, 103 S.Ct. at 2183 (quoting *Muschany v. United States*, 324 U.S. 49, 66, 65 S.Ct. 442, 451, 89 L.Ed. 744 (1945)) (emphasis added).

■ The Company offers numerous arguments in support of its position that the interest arbitration clause violates public policy.[4] Basically, the Company argues

---

4. Specifically, the Company argues that the interest arbitration clause concerns the Compa-

ny's duty to bargain and that the Board has exclusive, and apparently preemptive, authority

that it repudiated the prehire agreement before the Union invoked the interest arbitration clause, leaving no agreement to enforce. The Company also claims that, even if it was precluded from repudiating the prehire agreement before expiration, the interest arbitration clause nonetheless violates the public policy established by the NLRB in *John Deklewa & Sons,* 282 N.L.R.B. No. 184, 124 L.R.R.M. (BNA) 1185 (1987), *enforced sub nom. International Ass'n of Bridge Workers, Local 3 v. NLRB,* 843 F.2d 770 (3d Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 222, 102 L.Ed.2d 213 (1988).

Section 8(f) of the NLRA allows employers in the construction industry to negotiate and execute prehire agreements with nonmajority unions before any workers are hired or any work is commenced. *See* 73 Stat. 545; 29 U.S.C. § 158(f). This is in sharp contrast to § 9(a) that governs normal collective bargaining agreements. Congress advanced several reasons in support of this legislation when it amended the NLRA in 1959:

> One reason for this practice is that it is necessary for the employer to know his labor costs before making the estimate upon which his bid will be based. A second reason is that the employer must be able to have available a supply of skilled craftsmen ready for quick referral.

H.R.Rep. No. 741, 86th Cong., 1st Sess., 19 (1959), U.S.Code Cong. & Admin.News 1959, pp. 2318, 2335, *reprinted in* 1 NLRB, Legislative History of the Labor–Management Reporting and Disclosure Act of 1959 at 777 (quoted in *NLRB v. Local Union No. 103, Int'l Ass'n of Bridge Workers,* 434 U.S. 335, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978) (*Higdon*)).

> [Another] factor prompting Congress to enact § 8(f) was the uniquely temporary, transitory, and sometimes seasonal nature of much of the employment in the construction industry. Congress recognized that construction industry unions often would not be able to establish majority support with respect to many bargaining units.

---

over the duty to bargain. We reject this argument because the Company fails to support it with authority and fails to distinguish between the statutory duty to bargain and a contractual duty to bargain.

The Company argues that because the interest arbitration clause compels the parties to bargain and because the Arbitrator compelled the Company to enter a new agreement, the public policies of voluntary bargaining and voluntary agreement are violated. We reject these arguments because the alleged violations resulted from the original prehire agreement voluntarily executed by the Company.

The Company argues that we have no § 301 jurisdiction because the validity of the agreement is the ultimate question in this litigation. *See International Bhd. of Elec. Workers, Local 481 v. Sign–Craft, Inc.,* 851 F.2d 910 (7th Cir. 1988). The Company was apparently unaware that we reheard *Sign–Craft* after the original opinion was published. On rehearing, we reversed our earlier position, vacated the original opinion, and found that federal courts have § 301 jurisdiction even if the ultimate question is the validity of the agreement. *See International Bhd. of Elec. Workers, Local 481 v. Sign–Craft, Inc.,* 864 F.2d 499, 502 (7th Cir.1988).

The Company argues that imposition of a new contract violates the policy against single employer bargaining units because the employer had only one employee when the Arbitrator ordered the new contract. Considering the

transitory nature of the construction industry and other factors relied on by Congress when it authorized prehire agreements, we find that this argument is without merit. *See Jim McNeff, Inc. v. Todd,* 461 U.S. 260, 266, 103 S.Ct. 1753, 1756–57, 75 L.Ed.2d 830 (1983).

The Company argues that imposition of a new contract violates the principles of "employee free choice" and "top down organizing." The Company, however, offers no evidence that its employees were ever dissatisfied with Union representation during the term of the initial prehire contract. In addition, the Company can, with cause, challenge the Union's majority under the new contract and petition for a decertification election. Most importantly, this argument involves allegations of unfair labor practice charges and the Board has not yet rendered an initial decision on these allegations.

At oral argument, the Company added a new argument. It argued that since the original prehire agreement was executed between an employer's association of which it was not a member and the Union, the Company was not named in the interest arbitration clause and therefore not bound by it. The Company conceded, however, that it had subsequently signed the agreement. When the Company signed the agreement, it became bound by all of the agreement's terms including the interest arbitration clause.

The Company's remaining arguments regarding repudiation and the lack of a Union majority are analyzed in the body of this opinion.

*Jim McNeff, Inc. v. Todd,* 461 U.S. 260, 266, 103 S.Ct. 1753, 1756–57, 75 L.Ed.2d 830 (1983) (citations omitted). Until the union reaches a majority, a prehire agreement "does not have the same stature as a collective-bargaining contract entered into with a union actually representing a majority of the employees and recognized as such by the employer." *NLRB v. Local Union No. 103, Int'l Ass'n of Bridge Workers,* 434 U.S. 335, 341, 98 S.Ct. 651, 655, 54 L.Ed.2d 586 (1978) (*Higdon* ).

The Supreme Court has interpreted § 301 to mean that federal courts have jurisdiction over § 8(f) agreements. *See Retail Clerks Int'l Ass'n, Local Unions Nos. 128 and 633 v. Lion Dry Goods, Inc.,* 369 U.S. 17, 29, 82 S.Ct. 541, 548–49, 7 L.Ed.2d 503 (1962). The Court has interpreted § 8(f) to mean that a union's majority status may be litigated in a § 301 action and that prehire agreements may be repudiated until the union achieves majority status. *See Higdon,* 434 U.S. at 351–52, 98 S.Ct. at 660–61. In *Jim McNeff,* the Court clarified *Higdon* and held that while prehire agreements may be repudiated until the union establishes majority status, prehire agreements are enforceable until repudiated. *See Jim McNeff, Inc.,* 461 U.S. at 271–72, 103 S.Ct. at 1759.

When the Supreme Court decided *Higdon,* it reviewed and upheld the Board's interpretation of prehire policy as announced in *R.J. Smith Construction Co.,* 191 N.L.R.B. 693 (1971), *enforcement denied sub nom. Local No. 150, Int'l Union of Operating Engineers v. NLRB,* 480 F.2d 1186 (D.C.Cir.1973). Under *R.J. Smith,* an employer could unilaterally repudiate a prehire agreement before a union reached majority status and a union could reach majority status by means other than a certification election. *Id.* Since *Higdon* was decided by the Supreme Court, the Board has changed the policy it announced in *R.J. Smith* and the Supreme Court has not ruled on the new policy. *See John Deklewa & Sons,* 282 N.L.R.B. No. 184, 124 L.R.R.M. (BNA) 1185 (1987), *enforced sub nom. International Ass'n of Bridge Workers, Local 3 v. NLRB,* 843 F.2d 770

(3d Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 222, 102 L.Ed.2d 213 (1988).

In *Deklewa,* the Board reversed its previous policy and declared:

> When parties enter into an 8(f) agreement, they will be required ... to comply with that agreement unless the employees vote, in a Board-conducted election, to reject (decertify) or change their bargaining representative. Neither employers nor unions who are party to 8(f) arguments will be free unilaterally to repudiate such agreements.
>
> . . . .
>
> Even absent an election, upon the contract's expiration, the signatory union will enjoy no majority presumption and either party may repudiate the 8(f) relationship.

*Deklewa,* 124 L.R.R.M. (BNA) at 1194–95 (footnotes omitted). On appeal, the Third Circuit determined that the Board was not bound by the Supreme Court's affirmation of the Board's earlier policy. *See International Ass'n of Bridge Workers, Local 3 v. NLRB,* 843 F.2d 770, 776 (3d Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 222, 102 L.Ed.2d 213 (1988) (*Bridge Workers* ). The Third Circuit found that when the Supreme Court affirmed the Board's previous policy, the Court recognized that the Board was reasonably interpreting its statutory mandate. *Id.* The Supreme Court did not, however, determine that the Board's previous interpretation was the only reasonable interpretation of this statute. *Id.* Consequently, the Board was free to change its mind so long as its new policy was a reasonable interpretation of the statute. *Id.* The Third Circuit then reviewed the Board's new policy in order to determine if it was a reasonable interpretation of the statute. *See Bridge Workers,* 843 F.2d at 775. After thoroughly reviewing the Board's rationale, the Third Circuit affirmed *Deklewa* in all respects. *See Bridge Workers,* 843 F.2d at 779; *see also NLRB v. W.L. Miller Co.,* 871 F.2d 745 (8th Cir.1989) (adopting *Deklewa* and applying it retroactively with a minor modification due to a manifest injustice); *Mesa Verde Constr. Co. v. Northern California Dist.*

*of Laborers,* 861 F.2d 1124, 1137 (9th Cir. 1988) (*en banc*) (*Deklewa* adopted but case remanded for a determination of the retroactive application of *Deklewa*).

Thus, the Third, Eighth, and Ninth Circuits have determined that *Deklewa* changed the law with respect to when and how parties can repudiate a prehire agreement. Under *Higdon,* a party could unilaterally repudiate a prehire agreement at any time if the union had not achieved majority status, but under *Deklewa* a party can only repudiate unilaterally after the union is decertified during the term of the prehire agreement or after the agreement has expired. *See Higdon,* 434 U.S. at 351–52, 98 S.Ct. at 660–61; *Deklewa,* 124 L.R.R.M. (BNA) at 1194–95. *Higdon* and *Deklewa* involved the Board's interpretation and application of federal labor statutes. They did not, however, involve the interpretation of an interest arbitration clause. Consequently, neither *Higdon* nor *Deklewa* control our analysis of the validity of this interest arbitration clause. *See Jim McNeff, Inc.,* 461 U.S. at 267, 103 S.Ct. at 1757 (distinction between statutory and contractual obligations); *see also Sheet Metal Workers' Int'l Ass'n, Local 206 v. R.K. Burner Sheet Metal Inc.,* 859 F.2d 758, 761–62 (9th Cir.1988).[5]

Although neither *Higdon* nor *Deklewa* dispose of the issue before us, we think that the Board, in *Deklewa,* aptly traced the historical development of the laws governing prehire agreements and identified some of the underlying policy considerations that are pertinent here—labor stability and employee free choice. *See Deklewa,* 124 L.R.R.M. (BNA) at 1192. Labor stability is promoted by the existence of collective bargaining and agreements that result from such bargaining. Congress promoted labor stability in the construction industry by authorizing prehire agreements. At the same time, Congress compromised employee free choice by allowing nonmajority unions to negotiate agreements on behalf of nonexistent employees.[6] To offset this compromise of employee free choice, both the Board and the courts developed the repudiation doctrine. The approach adopted by the Board in *Deklewa* reflects an evolution of this doctrine and a balancing of employee free choice and labor stability. *See Deklewa,* 124 L.R.R.M. (BNA) at 1194–98.

The addition of an interest arbitration clause adds a factor not considered by the Board—arbitration. "Final adjustment by a method agreed upon by the parties is hereby declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement." 29 U.S.C. § 173(d). For almost 30 years, the Supreme Court has approved arbitration as a means for furthering "the national labor policy of peaceful resolution of labor disputes." *AT & T Technologies, Inc. v. Communications Workers,* 475 U.S. 643, 650, 106 S.Ct. 1415, 1419, 89 L.Ed.2d 648 (1986) (citation omitted); *see also Gateway Coal Co. v. UMW,* 414 U.S. 368, 377–78, 94 S.Ct. 629, 636–37, 38 L.Ed.2d 583 (1974); *Steelworkers Trilogy: United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. American Mfg. Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960).

---

**5.** Counsel for the NLRB conceded at oral argument that *Deklewa* did not control this case. Counsel argued that the Board wanted us to stay this appeal precisely because the Board wanted to consider the affect of an interest arbitration clause on *Deklewa.*

**6.** The nonexistent employees most often did exist and did belong to the union, but had yet to be hired. Most would be hired from union hiring halls. Congress recognized the peculiarity of the construction industry when authorizing prehire agreements and we certainly do not mean to imply that Congress completely disregarded workers' rights when it enacted this legislation. For a discussion of employee free choice in a situation where a cooperative labor agreement similar to a prehire agreement was approved for use outside of the construction industry, see Comment, *The Saturnization of American Plants: Infringement or Expansion of Workers' Rights?,* 72 Minn.L.Rev. 173 (1987).

Although some initial Supreme Court language suggested that arbitration would be limited to grievances and excluded the negotiation of new contracts (interest arbitration), *see Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 452 n. 3, 77 S.Ct. 912, 915 n. 3, 1 L.Ed.2d 972 (1957), the Fourth Circuit subsequently enforced an interest arbitration clause and stated that "[n]othing would be more out of step with our national labor policies than for the courts to refuse to enforce a voluntary agreement to arbitrate differences." *Winston–Salem Printing Pressmen Union, No. 318 v. Piedmont Publishing Co.*, 393 F.2d 221, 227 (4th Cir.1968). Other circuits have followed the Fourth Circuit's lead and upheld interest arbitration clauses. *See, e.g., Hotel Employees Union v. Williams*, 752 F.2d 1476, 1478–79 (9th Cir.1985); *Milwaukee Newspaper Union Local No. 23 v. Newspapers, Inc.*, 586 F.2d 19, 21 (7th Cir. 1978), *cert. denied*, 440 U.S. 971, 99 S.Ct. 1534, 59 L.Ed.2d 787 (1979); *Chattanooga Mailers Union, Local No. 92 v. Chattanooga News–Free Press Co.*, 524 F.2d 1305, 1314–15 (6th Cir.1975). The Supreme Court has not invalidated any of these holdings.

When we add this national labor policy that emphatically favors arbitration to the national labor policy that promotes labor stability and the peaceful resolution of labor disputes, the resulting policy combination overpowers the policy of employee free choice as interpreted by the Board in *Deklewa*. Another factor that, as a practical matter, sways our judgment is that there is no evidence in the record to indicate that the employees in this dispute were ever dissatisfied with their Union representation. The employees did not challenge their Union's ability to represent them during the original term of this contract. If they become dissatisfied under the new contract, they (or the Company) can challenge the Union's representative status by petitioning for a Board-conducted election. *See* 29 U.S.C. § 158(f). Since prehire agreements may be challenged at any time by employees, employers, or unions petitioning for a representative election, employee free choice is guaranteed. *See Jim*

*McNeff*, 461 U.S. at 268, 103 S.Ct. at 1757–58; *Higdon*, 434 U.S. at 345, 98 S.Ct. at 657–58.

We find no "well defined and dominant ... explicit public policy," *W.R. Grace & Co.*, 461 U.S. at 766, 103 S.Ct. at 2183, that prevents employers and unions from voluntarily agreeing to include an interest arbitration clause in a prehire agreement. The courts should encourage the peaceful, private resolution of labor disputes. When employers and unions voluntarily bargain and agree in light of then existing laws and policies, their agreements should be enforced.

### D. Arbitration Award

■ Having jurisdiction over an arbitrator's award that is based on an agreement not voided by public policy concerns, we review the Arbitrator's award using a most deferential standard. "Unless the arbitral decision does not 'dra[w] its essence from the collective bargaining agreement,' ..., a court is bound to enforce the award and is not entitled to review the merits of the contract dispute." *W.R. Grace & Co.*, 461 U.S. at 764, 103 S.Ct. at 2182 (quoting *United Steelworkers v. Enterprise Steel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960)); *see also Misco, Inc.*, 484 U.S. at ——, 108 S.Ct. at 370; *AT & T Technologies, Inc.*, 475 U.S. at 649–50, 106 S.Ct. at 1418–19. The Arbitrator accepted a dispute, which we have already determined was arbitrable, made a determination, and entered an award. In light of the automatic renewal provisions and the broad interest arbitration clause, the Arbitrator's decision clearly "dr[ew] its essence from the collective bargaining agreement." *Enterprise Steel & Car Corp.*, 363 U.S. at 597, 80 S.Ct. at 1361; *see also Nolde Bros., Inc. v. Local No. 358, Bakery Workers Union*, 430 U.S. 243, 252–55, 97 S.Ct. 1067, 1072–74, 51 L.Ed.2d 300 (1977).

■ While the Arbitrator had authority to resolve this dispute and enter an award, the Arbitrator did not, as the district judge properly noted, have authority to include an interest arbitration clause in the new

contract. *See R.K. Burner Sheet Metal Inc.,* 859 F.2d at 761; *American Metal Prod., Inc. v. Sheet Metal Workers, Local Union No. 104,* 794 F.2d 1452, 1456–57 (9th Cir.1986). The Arbitrator could not impose an interest arbitration clause, a nonmandatory bargaining item, on the parties against their will. *Id.*

 Because the Company's arguments raise jurisdictional concerns and we therefore have addressed them on their merits, we do not reach the Union's procedural bar argument. *See International Union of Operating Eng'rs, Local 150 v. Centor Contractors, Inc.,* 831 F.2d 1309, 1311 (7th Cir.1987); *Plumbers' Pension Fund, Local 130 v. Domas Mechanical Contractors, Inc.,* 778 F.2d 1266, 1268 (7th Cir.1985); *Chauffeurs, Local Union No. 135 v. Jefferson Trucking Co., Inc.,* 628 F.2d 1023, 1025 (7th Cir.1980), *cert. denied,* 449 U.S. 1125, 101 S.Ct. 942, 67 L.Ed.2d 111 (1981). Normally, a party who is dissatisfied with arbitration results must bring an action to vacate the award within 90 days of entry or be barred procedurally from later raising any affirmative defenses. *Id.* They are not barred, however, from raising issues affecting subject matter jurisdiction. Subject matter jurisdiction may be raised at any time. *See Insurance Corp. of Ireland, Ltd. v. Compagnie Des Bauxites De Guinee,* 456 U.S. 694, 702, 102 S.Ct. 2099, 2104, 72 L.Ed.2d 492 (1982); *City of Milwaukee v. Saxbe,* 546 F.2d 693, 699 (7th Cir.1976).

### III. CONCLUSION

We find it unnecessary to determine whether *Deklewa* expresses the current law governing repudiation of prehire agreements. Neither *Higdon* nor *Deklewa* control when the parties voluntarily agree to a broad interest arbitration clause with an automatic renewal provision. Nothing in our national labor policy prohibits parties from voluntarily including an interest arbitration clause in a prehire agreement. No public policy prohibits an arbitrator from enforcing such an interest arbitration clause. The arbitrator is, however, prohibited from imposing an interest arbitration

clause on parties against their will. Consequently, the judgment of the district court enforcing the arbitration award is AFFIRMED.